# HEINRICH ROTHENBURG and ANNA VIERATH *vs.* RUDOLPH VIERATH.

*Injunction—Appeal—Following Proceeds of Stolen Property Deposited in Bank in the Names of Conspirators.*

After an equity cause has been argued by both parties and a final decree made, it cannot be objected on appeal that the cause had not been regularly set down for final hearing, especially when the decree states that the cause stood ready for hearing.

A preliminary injunction was issued upon a bill not supported by a sufficient affidavit. Subsequently, the defendants answered, testimony was taken and a permanent injunction granted. *Held*, that on appeal the question as to the regularity of the preliminary injunction was immaterial and that the matter to be determined was whether the final decree was properly made upon the evidence in the case.

When money arising from the sale of stolen property is deposited in bank in the names of persons who conspired together to conceal it, the owner of the property, upon proof of such facts, is entitled to maintain a bill in equity to restrain the bank and the depositors from dealing with the fund and to have the same paid over to him.

The evidence in this case established the following facts : One of the defendants, who was the wife of a saloon-keeper in Berlin, had an intrigue with a cab driver in that city. When this affair was discovered, she stole from her husband certain Prussian Government bonds, which she sold and fled with her paramour, the other defendant, to America. Part of the proceeds of the bonds were deposited in a savings bank in the joint names of the man and the woman, the latter representing herself as being his wife. Neither of them brought to this country any other property. *Held*, that plaintiff, the woman's husband, was entitled to a decree enjoining the defendant's from drawing out the money and declaring the same to be his property.

Appeal from a decree of Circuit Court No. 2, of Baltimore City (STOCKBRIDGE, J.)

The cause was argued before McSHERRY, C. J., BRYAN, BRISCOE, PAGE, ROBERTS and BOYD, JJ. (April 21, 1898).

*T. J. Schaumloeffel* and *Edward L. Ward*, for the appellants.

*Louis P. Henninghausen* (with whom was *P. C. Henninghausen* on the brief), for the appellee.

Page, J., delivered the opinion of the Court.

There are certain preliminary questions, raised by the counsel for the appellants, that will be first considered.

It is contended that the case has never been set down for final hearing, and therefore it was erroneous to pass a final decree. This was denied as matter of fact by the appellee's counsel. However, we must accept the adjudication of the decree, to the effect that the cause stood ready for hearing; and even if this did not appear, it seems to be well founded, both upon reason and authority, that where a party, without objection, appears and participates in a premature final hearing, it is a waiver of the irregularity. 10 *Ency. Pleading and Practice*, page 15 and note 2.

It is also insisted that the affidavit to the bill is not sufficient, in that it is made neither by the plaintiff nor by any person having or professing to have personal knowledge of the facts set forth in the bill, and for that reason the preliminary injunction should not have been issued. This is alleged as ground for reversing the final decree. But the matter with which we are now concerned, is not whether the preliminary injunction was properly issued. The cause was before the Judge in the lower Court on final hearing, and what is now before us is whether on bill, answer and proof, the complainant has made such a case as properly entitles him to the decree actually entered. If this be affirmatively determined, it will be quite immaterial whether the preliminary writ was prematurely granted or not. An *ex parte* application for an injunction upon bill and exhibits goes to the sound discretion of the Court, and it must come verified in such a manner as to present strong *prima facie* evidence, in support of the averments, upon which the alleged equity rests. Such applications involve the exercise of a power, oftentimes demanding the highest degree of delicacy, caution and sound discretion, so that cases may

be conceived in which preliminary injunctions may be properly refused, upon facts which would entitle the party of right to an injunction on final hearing. *Ogden* v. *Kip*, 6 John. Ch. 160. But on final hearing the defendant has answered, testimony has been taken, and the whole case is before the Court. If it then appear that upon the principles of equity, the complainant ought to have a perpetual injunction, there can be no reason for denying it, because there may have been some irregularity or even insufficiency in the *prima facie* proof that should have been filed with the bill. On final hearing the Court cannot decree a perpetual injunction, unless the proof is adequate; so that any insufficiency that originally existed to make a *prima facie* case at the filing of the bill, must be fully supplied by the admissions of the defendant in his answer or otherwise, or in the evidence taken in the progress of the cause. Here the objection is raised at the final hearing, and it comes too late to prevent the complete adjudication of the whole matter involved, and the perpetuation of the injunction, if upon the principles of equity the facts proven shall so demand.

The substantial purpose of the bill is to obtain a decree declaring a certain fund on deposit in the Eutaw Savings Bank of Baltimore to be the property of the appellee and payable to him. The bill alleges that the appellee is a resident of Berlin, Prussia; and that Anna Vierath, now called Rothenburg, was his lawful wife, and lived with him until the third day of November, 1896; that on that day he obtained a conditional decree of divorce which was made final and absolute on the ninth day of February, 1897. That the ground of this decree (which was rendered by a Court of competent jurisdiction in the city of Berlin), was adultery with her co-defendant, Heinrich Rothenburg. That on the 26th of March, 1896, the said Anna left the home of the complainant taking with her bonds of the Prussian Government of the aggregate value of 10,000 marks, all of which were his exclusive property. That thereupon the complainant instituted suit and obtained a judgment, direct-

ing the said Anna to return the bonds or pay to him their full value; with which the said Anna did not comply, but converted them into money and exchange of the United States, and in the month of September, with the said Rothenburg, came to the United States and has ever since lived in the State of Maryland, cohabiting with the said Rothenburg. It is also further charged in the bill that the said Anna and Heinrich Rothenburg " confederated and conspired " together to defraud the complainant out of said money, and in furtherance of their scheme deposited on the twenty-second day of October what then remained of the complainant's money in the Eutaw Savings Bank of Baltimore, under the name of Heinrich Rothenburg and the false name of Anna Rothenburg ; that about $1,421.00 of said money is still on deposit in the bank, and that no part thereof belongs to either of said parties, but to the complainant. The prayer of the bill calls for answer under oath from the said Anna and Heinrich ; for a decree declaring the money still on deposit to be the property of the complainant; for an injunction restraining them from withdrawing or in any manner disposing of it, and for general relief. In its answer, the bank shows that on the 22nd of October, 1896, deposit account No. 132,228 was opened in the names of " Heinrich Rothenburg and Anna Rothenburg, subject to the order of either and survivor," and that there still remains the sum of $1,421.61. The appellants filed separate answers denying the fraud imputed to them in the bill. She admits she sold the bonds, but denies that she made any wrongful conversion of them, as they were her own at the time ; her husband having given them to her for the purpose of conciliating her, she having discovered him in the act of committing adultery with another woman. She avers that the proceeds of the said sale were consumed by her for her support and maintenance, and that the money in the bank was not hers but Rothenburg's. That it was deposited in his and her name, because they were engaged to be married upon being divorced from Vie-

rath, and it was intended to secure to her the money in the event of Rothenburg's death, "his occupation of stevedore being a dangerous and hazardous one." Rothenburg in his answer makes substantially the same averment and de-nials. He also denies that he left Prussia with Mrs. Vie-rath, but one month later, and avers he had no knowledge of the alleged conversion of the bonds, and that the money in dispute belongs to him, it being the proceeds of his business and the sale of his effects in Berlin.

There can no question be made as to the jurisdiction of the Court, to entertain a case like the one made by the bill. The averments contained in it, make out a gross fraud. Briefly stated, they charge, that one of the defendants, having stolen, sold and transferred the complainant's property, has confederated and conspired with her co-defendant to conceal the proceeds of the sale by a deposit in bank under a false name, with the purpose of finally converting it to their joint use. The averments of fraud in the bill are sufficient to vest jurisdiction and the mere denial of them in the answers does not oust it. *Dillon* v. *Conn. Mut. L. Ins. Co.*, 44 Md. 393.

The only question therefore remaining for us is, does the proof sustain the allegations contained in the bill? It is not disputed that the ownership of the bonds was in the complainant at the time his wife appropriated them, and must still remain there, unless in some legal manner he has parted with his title. Mrs. Vierath states that he gave them to her, and that the inducement for his so doing was to conciliate her, she having caught him in an act of adultery and keep her from " telling her parents." Vierath was a saloon-keeper in the city of Berlin. From suggestions contained in the evidence, we may infer that he was not possessed of large means. He must have known of Rothenburg's attention to his wife; they were driving together and he had been taking her to picnics, parties and on excursions. It strains our credulity not a little to be required to believe, that under these circumstances Vierath

could have been so deeply moved by the discovery of his wife (if it were true), as to be willing to buy her silence and conciliate her, with the large sum of 10,000 marks.    It is a most suggestive fact that immediately after she obtained the bonds she fled from her husband's house.    Vierath then could not have known where the bonds were, for not long after she left, we find him instituting legal proceedings to enquire into an alleged theft of papers, in which Rothenburg was implicated and was not discharged until Mrs. Vierath had testified that she herself had taken them.    It was on this occasion probably that Vierath first learned what had become of his bonds.    Mrs. Vierath does not deny that she took the bonds and sold them.    She contends, however, that she had spent the proceeds when she arrived in America, four months later.    It is difficult to accept her statement of how it went.    On leaving her husband she staid with her parents, and paid them board.    She found " it was necessary," she states, to have a " city residence on account of the pending suit," but what the suit was or why it required a "city residence," does not appear. She speaks in her testimony of furnishing it, as if it involved large expenditures.    She says she purchased for it, ' all that belonged to a household," " it would take too long to give a detailed statement."    Yet this " city residence," contained but one room and the rent of it was twelve marks per month.    She also alleges she spent two thousand marks for clothing; yet all she had, she brought to America in one trunk, one satchel and two baskets.    On the other hand, her journey to Liverpool, as described by herself, would seem to indicate, not only the possession of ample funds, but also a desire to avoid observation.    Instead of taking the usual and shortest route, she selected an unusual and round-about one, and pursued it in a leisurely fashion, as one with abundant means.    At Wesel she lingered four days " for her pleasure;" at Antwerp two weeks, and at Liverpool ten days.    She says " she went to look at everything."    Instead of travelling under her own

name, she adopted false ·names, and when she was asked why she had done so, absolutely refused to give the reason. All this is inconsistent with the theory, that she was an honest woman without means, making an earnest effort to reach a land where she hoped to better her fortunes; but is easily understood, if she be regarded as one in the possession of stolen money seeking to get beyond the reach of pursuit, and to a place where she could enjoy the spoil with safety.    The conclusion is forced upon us, even from her own evidence, that when she left Prussia she carried with her the great bulk of the money she had taken from her husband, and that one of the objects she had in leaving the country, was to prevent him from reclaiming it.

Was Rothenburg a participant in this fraudulent scheme? He admits having met a young man named Joos at Antwerp, and journeyed with him to this country. The two became intimate on the passage, and after they arrived in this country, lived on the same farm in the service of the same master. In his conversations with Joos, Rothenburg seems to have been very unreserved.    He tells him everything about his relations with Mrs. Vierath, and why he left Berlin. Rothenburg denies that he had such conversations, but that he had cannot be doubted.   Joos has given us facts, conceded to be correct, that he could only have obtained in the manner which he has related.    He is also corroborated by the witness Blum, to whom Rothenburg was equally confidential.    The conversations of Rothenburg as detailed by Blum, are substantially the same as those testified to by Joos.    On the other hand the testimony of Rothenburg is burdened with all the implications to be drawn from the established facts, with the necessity of forcing strange and unusual coincidences in any attempt to harmonize his statement, and with the caution with which the statements of one so deeply interested in the results of the litigation must always be received.    Moreover the statement made by him to Joos and Blum at a time when further concealment was no longer necessary and made too in the freedom of friendly intercourse,

are more to be relied upon, than his testimony offered dur-
ing the pendency of the cause. Joos and Blum are entirely
disinterested witnesses, each sustains the other, and the facts
disclosed in the conversations of Rothenburg seem to be
consistent with all the probabilities of the case. Without
further discussing the comparative value of the evidence of
these witnesses, we may say that we believe the substantial
truth of the relations between the two appellants is to be
gathered from the conversations and facts detailed by Joos
and Blum. From these conversations, taken in connection
with all the evidence in the case, we think it clear that
Rothenburg was a full participant in the acts of Mrs. Vierath
in her attempts to successfully elude her husband and retain
his money. His intimacy with her continued as long as
she remained in Berlin. When she determined to leave, he
knew it and in consequence decided to give up his business
and go himself. It is clear that not only the time of her
departure, but the circuitous route selected and the false
names she assumed, were all parts of a carefully precon-
ceived plan. The plan was somewhat disarranged by his
unplanned stop-over at Gladback. Finding that Vierath was
on his train, he had to leave it at that point and remain there
for a few days, until he had received information that Vierath
was back at home. He then resumed his journey, stopping
next at Antwerp, where he met the witness Joos. The un-
anticipated stop at Gladback had exhausted his funds, and
he telegraphed to Anna, then in Liverpool, to send him more;
and not receiving them he borrowed fifty-two marks from
Joos, telling him at the time that his wife (meaning Anna
Vierath) would return it. With the funds thus obtained, he
travelled in company with Joos on to Liverpool. When
they arrived, after a day and night on the way, they went
to the "Hotel of the Ship's Company," and Rothenburg im-
mediately asked for " his wife," meaning Anna Vierath.
When she appeared, he asked why " she had not sent
money to Antwerp," and she said she had. She then re-
paid Joos the money he had loaned, and in the evening went

out with Rothenburg and purchased clothing for his use. The next day the ship sailed for Boston, carrying both of them and Joos, with through tickets to New York. On the trip Rothenburg's communications to Joos became unreserved. He tells him he was going to America, because of his wife, and that he had sold his business in Berlin for enough to "get him through to New York" and that his wife had given him the money that he exhibited. He seems to have had no money after he left Antwerp, except such as he received from Mrs. Vierath. In Boston he offered twenty-five dollars to Joos to enable him to pass through the Emigrant Commissioner's office more easily, but to get it, he had to go to his wife, and stated at the time that the money belonged to her. We cannot accept his statement that his money came from the proceeds of the sale of his horses and other things in Berlin. That a small sum was thus derived is doubtless true; but if it was, he had expended it all when he reached Antwerp, and after that he was dependent upon her. Nor has she failed to assert her claim to the money. When she learned it was deposited in Rothenburg's name, she was greatly excited, complained to him about it, who in turn becoming angry, exclaimed: "She could do with her damned money as she pleases;" but later on, goes back to the bank and procures the account to be placed in the name of both " subject to the order of either and survivor." He undertakes to explain this entry by the false statement that his occupation was a dangerous one (that of stevedore), and he desired to secure the money to her in case of his death. In fact he was not a stevedore and his occupation, that of felling and hauling trees, not a dangerous one.

We deem it unnecessary and profitless, to discuss this testimony at greater length. We content ourselves with saying we find the averments of the bill fully sustained. We are of opinion that the money on deposit in the Eutaw Savings Bank, is part of the proceeds of the sale of the complainant's bonds ; that these bonds were stolen from him

by Anna Vierath, that in the scheme to appropriate and re-
tain the spoil, Rothenburg is a guilty partner; and that
finally, having successfully eluded pursuit as they supposed,
they have deposited it in the bank, whence they can draw
it at pleasure for their own use.

We have made no allusion to the exhibits purporting to
be copies of judgments in the Prussian Courts. If we had
relied upon them, they would have materially supported the
conclusion we have reached.

*Decree Affirmed.*

(Decided June 28th, 1898).